### Wisconsin Steel Company v. Dixon.

(Decided June 16, 1914.)

### Appeal from Harlan Circuit Court.

1. Master and Servant—Injury to Servant—Reasonably Safe Place to Work—Evidence—Sufficiency.—In an action by a servant for personal injuries based on the failure of the master to furnish a reasonably safe place to work, resulting in plaintiff's being struck by a rib of coal while riding on a motor car in a coal mine, evidence examined, and held that a verdict in favor of plaintiff was not flagrantly against the evidence.

2. Master and Servant—Injury to Servant—Conflicting Evidence— Question for Jury.—In an action by a servant for personal injuries, where the evidence is conflicting on the issues raised, these questions are peculiarly within the province of the jury.

3. Release—Misrepresentations—Effect.—Where a servant, on being injured, signs a receipt compromising his claim against his employer for damages, on representations that he is entitled to the

amount received as "policy money," kept up by the employer, it is not binding as a release of damages.

4. Release—Misrepresentations—Effect—Question for Jury.—In an action by a servant for personal injuries, held under the evidence that the validity of a release of plaintiff's claim was a question for the jury.

SAMPSON & SAMPSON for appellant.

ZEB. A. STEWART and F. F. ACREE for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiff, B. F. Dixon, brought this suit against defendant, Wisconsin Steel Company, to recover damages for personal injuries. In addition to a general denial and a plea of contributory negligence, defendant pleaded a settlement of plaintiff's claim. The jury returned a verdict in plaintiff's favor for $2,500. Defendant appeals.

According to the evidence for plaintiff, the accident occurred on September 17, 1912. Prior to that time he had been engaged in removing broken and fallen slate from the mine. On the morning of the accident he was directed by defendant's foreman to act as coupler on the motor, the engine used to propel cars into and out of the mine. After going into the mine and leaving some empty cars, the motorman directed him to get on the stirrup. There were two stirrups on the motor, one on each side. On these stirrups the couplers were accustomed to ride. As the motor proceeded out of the mine plaintiff had his feet on the stirrup, with his body bent over to avoid the roof. After proceeding about 75 feet, plaintiff was caught between the motor and the rib of coal at what is known as a narrow place. His knees were cut, his arm and back sprained, his right leg bruised, and his left hip dislocated at the hip joint. At the narrow place there was a space of from three to eight inches between the motor and the rib. He was attended by the company's physician and trained nurse for about two weeks. At the end of that time he was furnished with a pair of crutches. As he desired to go home, the company's physician told him to go to defendant's office and get his policy money. The physician estimated the time that plaintiff had lost and the time that it would take him to recover, and wrote a few lines on a slip of paper. Plain-

tiff handed the paper to one of defendant's employes in the office. This employe asked him to sign the receipt, and when he had done so paid plaintiff $24.41. Plaintiff claims that this receipt, which was in full for all claims for damages against the company on account of his injury, was explained to him as being a receipt for his "policy money." He also claims that the contents of the paper were not read to or explained to him, and that he was unable to read the paper himself, not only on account of his lack of ability, but because of his pain and suffering at the time. Relying on the representation that the receipt was for his policy money, he signed it. Plaintiff then remained at his home for a period of about five weeks. As he still suffered from his injuries, he went to Harlan and consulted Doctors Dierach, Howard and Caywood. On examination, they found that his hip was dislocated. They gave him an anaesthetic, and restored his hip to its socket. The physicians who attended him corroborated plaintiff's statement in regard to the dislocated condition of his hip when he presented himself to them, and the necessity for the operation to restore the hip to its proper position. Plaintiff also testified that some shots had been fired in the mine, and on account of the smoke and insufficient light, he did not and could not see the narrow place. He also stated that he had not been warned of the existence of the place.

According to the evidence for defendant, as given by its physician and trained nurse, plaintiff's hip was not dislocated as the result of the accident. The physician examined him thoroughly, and subsequently the trained nurse frequently bathed him, and they both say if plaintiff's hip had been dislocated they would have known it. Other witnesses testify to the fact that plaintiff used and moved his leg in a way that would have been impossible had his hip been dislocated. Two or three witnesses also testify that plaintiff was advised of the presence of the narrow place, and told to look out for it. He was also warned to ride on the other side of the motor, where· there was abundant space, and where there would have been no risk of injury. Plaintiff declined to do this because he did not wish to be brushed in the face by a curtain which the motor occasionally passed. There is also evidence to the effect that plaintiff's position on the stirrup was not the proper one. Had he placed his feet on the stirrup properly, and leaned over in the correct position, he would not have been injured. Defendant

also showed that it conducted a relief department in connection with its mining establishment, the purpose of which was to provide some compensation for employes without regard to the manner in which they were injured. One who accepted benefits in the department released the company from all other liability. The physician who attended plaintiff says that plaintiff had not fully recovered when plaintiff notified him that he was going to leave. He was getting well, however, and he estimated that in about three weeks plaintiff would be well. Plaintiff was therefore entitled to time already lost and that which he would probably lose, and on this basis he recommended to the company the compensation allowed. Two of defendant's employes who were present when the receipt was signed testified that the receipt was read over to plaintiff and fully explained to him. He thereupon signed it. The relief department is supported by contributions from the employes and from the company.

The instructions given by the trial court presented in clear and concise language every issue raised by the pleadings, and are not subject to criticism.

The only substantial complaint of defendant is that the verdict is flagrantly against the evidence. It must be admitted that the place where plaintiff was injured was not reasonably safe, especially in view of the fact that the coupler was required not only to protect himself from injury from the rib, but from the top of the roof. Of course, if plaintiff knew of the narrow place, or it was obvious to a person of ordinary prudence, or if he was warned of the dangerous character of the place, or was directed to ride on the other side of the motor where there was no danger, or, in riding on the motor, failed to exercise ordinary care for his own safety, and by reason thereof was injured, he could not recover. On all these issues, however, the evidence was conflicting, and the questions were therefore peculiarly within the province of the jury. Aside from these issues, however, it is insisted that upon the issue whether or not plaintiff's hip was dislocated by the accident the evidence is certainly not sufficient to support the verdict. On one side there is the plaintiff's testimony to the effect that his hip was dislocated, corroborated by the evidence of the Harlan physicians that it was dislocated when operated upon by them, and that they restored it to its proper position. On the other hand, defendant's physician and trained nurse say that his hip was not dislocated by the

accident. Others say that the use which he is shown to have made of his leg was practically impossible if his hip had been dislocated. It is, of course, impossible to reconcile the statements of these witnesses. It is insisted that the circumstances point to a manufactured claim for damages. There is, however, no substantial basis for this contention other than the positive evidence of defendant's witnesses that plaintiff's hip was not dislocated by the accident. In view, however, of the fact that the Harlan physicians testify unequivocally that plaintiff's hip was dislocated, and the further fact that its dislocation cannot be accounted for on any reasonable basis except that of its injury at the time of the accident, the question resolves itself into one of mere credibility of witnesses, and we have repeatedly held that this is a question for the jury.

On the question of fraud in obtaining the release, the facts are very similar to those developed in the case of Louisville Veneer Mills Co. v. Clemonts, 109 S. W., 308, where it was held that a receipt compromising an injured servant's claim was not binding as a release where he was induced to sign it on representations that he was entitled to the amount received as accident insurance kept up by the employer. While upon this phase of the case perhaps the weight of the evidence is with defendant, yet we cannot say that the verdict is flagrantly against the evidence.

Judgment affirmed.